IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **BRIAN HERNÁNDEZ JAVIER**<br><br>Plaintiff<br><br>v.<br><br>**CONTINENTAL CASUALTY COMPANY d/b/a/ CNA SURETY CORPORATION**<br><br>**Defendant** | **CIVIL NO. 16-**<br><br>**DISABILITY DISCRIMINATION; RETALIATION;<br>HOSTILE WORK ENVIRONMENT;<br>CONSTRUCTIVE DISCHARGE;<br>DAMAGES**<br><br>**TRIAL BY JURY DEMANDED** |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW plaintiff, Brian Hernández Javier ("Hernández"), through the undersigned attorneys, and very respectfully states, alleges and prays:

### I. NATURE OF THE ACTION AND JURISDICTION

1. This action is brought pursuant to the Americans with Disabilities Act ("ADA") and Americans with Disabilities Act Amendments Act ("ADAAA"), 48 U.S.C. §§12101, *et seq.*; Puerto Rico Law No. 44 of July 2, 1985, as amended ("Law No. 44"); the Puerto Rico Disabilities Act, Puerto Rico Law No. 53 of August 30, 1992, as amended ("Law No. 53"); Puerto Rico Law No. 115 of December 20, 1991 ("Law No. 115"); and the Puerto Rico Unjust Dismissal Act, Law No. 80 of May 30, 1976 ("Law No. 80"), seeking compensatory, double economic and emotional damages, and equitable and injunctive relief to seek redress for defendant's disability discrimination, retaliation and hostile work environment against Hernández, as well as compensation for wrongful discharge under Law No. 80.

2. This court has diversity jurisdiction to entertain this action pursuant to 28 U.S.C. §1332, because the plaintiffs and the defendant are citizens of different states. Plaintiff is a citizen of Puerto Rico and the defendant is a citizen of Illinois for purposes of 28 U.S.C. §1332.

3. This court also has jurisdiction to entertain this action pursuant to the ADA and ADAAA, 42 U.S.C. §§12101, *et seq.*

4. Venue is proper in this district pursuant to 28 U.S.C. §1391 (b)(1) and (2), as all the discriminatory and retaliatory employment practices alleged in the Complaint occurred within the judicial district of Puerto Rico.

## II. THE PARTIES

5. Hernández is of legal age, a citizen of the United States and a resident of Puerto Rico.

6. The defendant, Continental Casualty Company (hereinafter referred to as "CNA"), also does business under the name CNA Surety Corporation.

7. CNA is a corporation incorporated under the laws of the state of Illinois.

8. CNA is duly authorized to do business in Puerto Rico as a foreign entity by the Department of State of the Commonwealth of Puerto Rico.

9. Hernández began working for CNA in 2001 in the position of Director and Branch Manager for CNA's branch in San Juan, Puerto Rico.

10. Hernández is an employee under all of the federal and local statutes upon which he bases his requests for relief.

11. At all times relevant to this complaint, Hernández suffered from severe depression.

12. Hernández's severe depression affected his major life activities of sleeping, concentrating, thinking, communicating and working.

2

13. At all relevant times, Hernández was an "employee with a disability" under the provisions of the ADA and ADAAA, and is within the protected class under those statutes as well as under their Puerto Rico counterparts.

14. In the alternative, defendant regarded Hernández as disabled because it perceived his depression condition as a disability under the ADA and the ADAAA.

15. At all times relevant herein, CNA was Hernández's employer.

16. CNA employs more than twenty (20) employees on a daily basis as the term is defined in 42 U.S.C. §12114.

17. CNA employs more than five thousand (5,000) employees.

18. CNA is an "employer" under all of the federal and state provisions of law under which Hernández claims relief.

19. CNA is an "employer" under Puerto Rico Laws Nos. 44, 53, 80 and 115.

### III. ADMINISTRATIVE PROCEEDINGS

20. Hernández filed a timely charge of employment discrimination on the basis of disability with the Anti-Discrimination Unit of the Department of Labor ("ADU") on January 7, 2016. The ADU referred the charge to the Equal Employment Opportunity Commission ("EEOC"). The charge number at the EEOC is 16H-2016-00167.

21. The EEOC issued its Notice of Right to Sue as to Hernández's charge on August 12, 2016.

22. The instant complaint is being filed within ninety (90) days of Hernández's receipt of the Notice of Right to Sue.

### IV. THE FACTS

23. Hernández repeats and incorporates each and every preceding allegation as if fully set herein.

24. Hernández began working for CNA in 2001 in the position of Director and Branch Manager for CNA's branch in San Juan, Puerto Rico.

25. CNA is dedicated, among other things, to the provision of surety and fidelity bonds.

26. Ever since Hernández began working for CNA until the year 2014, Hernández would receive an annual salary increase from the company. The annual salary increase would be provided in the month of March, and it would consist of a 2.5% salary increase.

27. For example, Hernández's yearly salary for the year 2012 was approximately $125,000.00, and in March 2013, he received the corresponding salary increase and, as a result, his 2013 yearly salary was approximately $128,000.00.

28. Similarly, he received his salary increase once again in March 2014 and, as a result, his 2014 yearly salary was approximately $130,000.00.

29. Hernández would also receive a performance bonus in March of each year.

30. At all times relevant to this case, Michael J. Groman ("Groman") was the Vice-President of CNA and Hernández's supervisor.

31. On October 16, 2014, Groman commented to Hernández that there were some files which were not up to date.

32. On October 28, 2014, Groman and Hernández held a meeting at Bottles Restaurant in Guaynabo, Puerto Rico.

33. During the meeting, Hernández explained to Groman that he had been diagnosed with severe depression.

34. Hernández had been diagnosed with severe depression since January 2013.

4

35. Hernández also told Groman that his severe depression condition affected his work and that he was under medication.

36. Hernández added that the various sick days he had taken during the year 2014 were as a consequence of his severe depression condition.

37. Although the severe depression condition affected Hernández's major life activities, including that of working, it did not impede him from fulfilling the essential duties of his job as long as he continued taking his medication.

38. Immediately upon being informed by Hernández as to his disability, Groman responded to Hernández that, come March 2015, he would not receive a salary increase and that he would only get a very small performance bonus.

39. March is the month in which CNA employees who are entitled to receive bonuses and salary increases receive the same.

40. Groman also demanded that, from now on, Hernández provide him with weekly updates as to his work progress.

41. Groman further demanded that Hernández work additional hours to his regular work schedule, despite the fact that this was contraindicated to his depression condition.

42. This was the first time in Hernández's fifteen (15) years working for CNA that Hernández would be deprived of his performance bonus and salary increase.

43. It was also the first time that CNA demanded that Hernández provide weekly updates as to his work progress and that it forced him to work additional hours beyond his regular schedule.

44. In compliance with Groman's instructions, Hernández began placing files as up to date as possible and to document his work as much as possible.

5

45. Hernández complied to the best of his ability in the ensuing months with providing the updated files to Groman.

46. Pursuant to the decision notified by Groman to Hernández in October 2014 during their meeting at Bottles Restaurant, CNA deprived Hernández of his salary increase in March 2015.

47. Hernández's yearly salary for 2015 remained set at $130,000.00 and was not increased by 2.5%, contrary to what had happened in all of Hernández's prior years at CNA.

48. Moreover, Hernández was supposed to receive a performance bonus of $24,000.00 in March 2015, but instead received only $11,000.00.

49. The decision to deprive Hernández of his salary increase and to reduce his performance bonus, as well as to demand weekly reports from Hernández, were motivated by a discriminatory *animus* against Hernández on account of his disability.

50. During the dates of March 9 to 12, 2015, Hernández was audited by CNA Internal Audit.

51. There was no reason for the audit.

52. Indeed, over two months later, on May 29, 2015, one of CNA's underwriters, Elio Sánchez, admitted to Hernández that the March 2015 audit which CNA did to Hernández was unjustified because the sample size was exactly the same as CNA's Orlando, FL office, which is ten (10) times bigger than the San Juan, PR office.

53. The audit was a sham aimed at discriminating against Hernández on account of his disability and to create a hostile work environment against him.

54. On April 10, 2015, Groman terminated all of Hernández's Approval Authority as well as his Discretional Authority on Contract Accounts.

55. Groman claimed that these would be terminated for perhaps one, two or three months.

56. On that same date, Groman also commented that Hernández's Account Annual Reviews were deficient and that Hernández "had never done a good one in five (5) years." However, this was the first time that CNA claimed any sort of deficiency with respect to Hernández's Account Annual Reviews.

57. Groman further added that he "doubted" that Hernández would be able to make a good Account Annual Review moving forward.

58. CNA's decision to deprive Hernández of his duties regarding Approval Authority and Discretional Authority on Contract Accounts were motivated by its continued desire to discriminate against him on account of his disability.

59. Groman's claim that Hernández had never done a good Account Annual Review constituted a *post hoc,* false and pretextual justification to discriminate against Hernández, inasmuch as he had never been admonished of said alleged deficiencies prior to informing that he suffered from a disability.

60. Groman's comment that he "doubted" Hernández would make a good Account Annual Review moving forward was also motivated by discriminatory *animus*. Groman was well aware that Hernández was complying with his work duties despite suffering from severe depression.

61. In April 2015, one of CNA's Time Sheet Auditors called Hernández.

62. The Time Sheet Auditor accused Hernández of altering the time sheets of the employees whom Hernández supervised (hereinafter referred to as "Hernández's assistants"), in order to avoid paying them overtime.

63. Hernández denied the Time Sheet Auditor's accusation.

64. Hernández explained that he had changed the time sheets because there were technical problems with the time sheet system which were not allowing Hernández's assistants to register their time correctly. Each time that one of Hernández's assistants would enter their time, the system would register the time incorrectly because of an error in the system's clock.

65. CNA's imputation that Hernández was trying to avoid overtime payments to his assistants was aimed at fabricating an excuse to admonish and/or terminate him, as well as to continue pressuring him in order to get him to resign. This was part of CNA's discriminatory campaign against Hernández and its continued efforts to perpetuate a hostile work environment against him.

66. The pressure caused by the discriminatory and hostile work environment exerted upon Hernández became such that Hernández was left with no choice but to request a three-day vacation on May 7, 2015.

67. Hernández requested the three-day vacation from Groman.

68. Groman asked Hernández why he had to take a three-day vacation.

69. This was the first time in Hernández's time as a CNA employee that he had been questioned for taking a three-day vacation.

70. Hernández responded to Groman that he was emotionally affected and needed a break from the office.

71. Hernández took the three-day vacation.

72. On May 8, 2015, which was the first day of Hernández's three-day vacation, Groman and the Time Sheet Auditor who had accused Hernández of altering the time sheets called

Hernández's assistants via telephone and began harassing them and trying to force them to say that Hernández had manipulated the time sheets.

73. Hernández's assistants responded that Hernández had not manipulated any time sheets and they refused to say what Groman and the Time Sheet Auditor were trying to get them to say.

74. On May 11, 2015, Hernández returned from his three-day vacation.

75. On that date, Hernández's assistants informed him of the attempt by Groman and the Time Sheet Auditor to get them to say that Hernández was manipulating the time sheets.

76. On May 15, 2015, Groman sent a harassing e-mail to Hernández, in which he claimed that Hernández "did not understand the new way to keep the files up to date."

77. Hernández responded that, as Groman was aware, roughly only two weeks prior to that, on April 27, 2015, CNA had replaced the entire computer system of the San Juan Branch.

78. Hernández also reminded Groman that, upon the installation of the new system, there was downtime because there was a seven-day period during which the new system did not operate.

79. Hernández also told Groman that, as a result of the fact that CNA had deprived him on April 10, 2015 of his Approval Authority and of the new approval system which CNA had implemented for Hernández, the issuance process in his office had become very slow and the clients were starting to complain.

80. It became evident to Hernández that the April 10, 2015 decision to deprive him of his approval authority was not only aimed at discriminating against him on account of his disability, but also to place unnecessary obstacles in his work to justify terminating him and/or pressuring him to get him to resign.

81. Groman hostilely responded that, if Hernández could not handle the workload, then he needed to get rid of accounts, but that he would not give Hernández his Approval Authority back.

82. On May 28, 2015, CNA sent one of its underwriters, Elio Sánchez, to "retrain" Hernández and his staff.

83. Hernández had never been subjected to such "retraining" in his entire time working for CNA.

84. The alleged "retraining" was a pretext to continue harassing Hernández, as well as an additional fabricated excuse for CNA to support its false and pretextual position that Hernández was not performing his job adequately.

85. On May 29, 2015, Hernández complained to Groman about the hostile environment which had been perpetrated upon his assistants when they were harassed during the days in which he was on vacation to get them to say that Hernández had altered the time sheets (hereinafter referred to as "Hernández's May 29, 2015 complaint").

86. CNA took no action whatsoever with respect to Hernández's May 29, 2015 complaint.

87. Hernández's May 29, 2015 complaint constituted protected conduct under Law No. 115, as amended.

88. On June 15, 2015, Hernández requested approval of sponsoring for an AGC Golf Tournament.

89. In prior years, the approval for said tournament had taken one (1) to two (2) days.

90. This time, however, the approval took over a month.

91. This was part of CNA's continued discriminatory and harassing campaign against Hernández.

92. It was also in retaliation in response to Hernández's May 29, 2015 complaint.

93. During the month of July 2015, Hernández received several complaints from his clients due to the slow approval process.

94. The slow approval process was not due to Hernández's work performance.

95. The proximate cause of the slow approval process was CNA's discriminatory decision to deprive Hernández of approval authority.

96. In early August 2015, Hernández received his mid-year evaluation review.

97. Groman admitted that Hernández's work was up to par and that all the files were in the correct way and form.

98. Despite Groman's appraisal, he did not restore any of Hernández's authority levels.

99. This was contrary to Groman's representations in April 2015 that he would return the authority levels at least after three (3) months.

100. There was no reason not to restore Hernández's authority levels.

101. CNA's decision to continue depriving Hernández of his authority levels was aimed at continuing to discriminate against him on account of his disability and to pressure him in order to get him to resign.

102. It was also as part of its continued efforts to retaliate against him for Hernández's May 29, 2015 complaint.

103. On September 10, 2015, Hernández held a meeting with Elpidio Rivera ("Rivera").

104. Rivera is the president of Team Insurance Services, Inc., one of CNA's clients.

105. Rivera was one of the clients who had complained to Hernández in July 2015 of the slow approval process.

106.    During the meeting of September 10, 2015, Rivera commended Hernández on his efforts to accelerate approvals under the restraining circumstances in which CNA had placed him.

107.    On September 14, 2015, Hernández was faced with a substantial amount of requests by clients for approvals of bonds.

108.    Hernández knew that, as a direct result of CNA's discriminatory and retaliatory decision to deprive him of his approval authority, it would not be possible for these approvals to go through with the speed desired by the clients.

109.    Hernández's blood pressure increased to 170 over 100, and he had to go home to take medication and a cold shower in order to attempt to reduce his blood pressure.

110.    As a result of the pressure exerted upon him by CNA's discriminatory and retaliatory decisions, including the obstacles it purposely placed in front of him with respect to his approval authority, Hernández resigned from employment on September 15, 2015.

111.    CNA's discriminatory and retaliatory conduct left Hernández no choice other than to resign.

112.    All of the obstacles which CNA placed in Hernández's path made it impossible for him to continue in his position.

113.    Moreover, Hernández had to resign in order to ensure his medical condition did not worsen, to mitigate his emotional damages and to avoid further damages to his health.

114.    CNA was aware that the reason for Hernández's resignation was that he was emotionally crippled as a result of its discrimination and retaliation.

115. Indeed, a day after Hernández's resignation, on September 16, 2015, CNA's Human Resources Director, Tracy Hagen, sent an e-mail to Groman with the contact information for CNA's Employee Assistance Program, Lifeworks.

116. Lifeworks is an employee assistance and wellness program that is dedicated, among other things, to help employees who are enduring stress at work.

117. On September 17, 2015, Groman forwarded to Hernández the contact information for Lifeworks.

118. Groman knew on September 17, 2015 that Hernández was no longer a CNA employee since he had resigned two days earlier.

119. CNA's decision to "provide" Hernández the contact information for Lifeworks two days after he had already resigned from the company was a *post hoc* attempt at concealing its discriminatory *animus* and at giving the impression of compliance with the ADA and the local statutes which prohibit disability discrimination.

120. Groman knew from almost a year earlier, since their meeting at Bottles Restaurant in October 2014, that Hernández was afflicted by his severe depression condition and that the same was affecting his major life activity of working.

121. As a result of CNA's discriminatory and retaliatory conduct, Hernández has suffered severe emotional and economic damages.

### V. FIRST CAUSE OF ACTION (Disability Discrimination under ADA and ADAAA)

122. Hernández repeats and realleges each and every preceding allegation as if fully set herein.

123. Hernández was discriminated against by CNA on the basis of his disability.

124. Hernández has suffered severe economic and emotional damages as a result of CNA's discrimination on account of his disability.

13

125. CNA's conduct constitutes a violation of the ADA and the ADAAA.

126. Hernández is entitled to economic and emotional damages and continuous loss of income caused as a proximate result of CNA's discriminatory conduct, in violation of the ADA and the ADAAA.

127. As a result of CNA's discriminatory conduct, Hernández is also entitled to injunctive relief in the form of an order against CNA to cease and desist of any further discriminatory and retaliatory conduct against Hernández.

## VI. SECOND CAUSE OF ACTION (Punitive damages for disability discrimination under the ADA and ADAAA)

128. Hernández repeats and reincorporates each and every preceding allegation as if fully set herein.

129. CNA's discriminatory practices against Hernández were malicious and/or carried out with reckless indifference towards Hernández's federally protected rights.

130. CNA knew or should have known that its conduct towards Hernández contravened the ADA and the ADAAA.

131. As a result of CNA's disability discrimination against Hernández, CNA is liable for punitive damages in the amount of $299,999.00.

## VII. THIRD CAUSE OF ACTION (Hostile Work Environment)

132. Hernández repeats and reincorporates each and every preceding allegation as if fully set herein.

133. CNA, through its agents, subjected Hernández to a hostile work environment.

134. Hernández suffered severe emotional damages as a result of the hostile work environment to which he was subjected.

135. CNA is liable to Hernández for the damages proximately caused by the hostile work environment to which he was subjected.

## VIII. FOURTH CAUSE OF ACTION (Disability Discrimination under Puerto Rico Laws Nos. 44 and 53)

136. Hernández repeats and incorporates by reference each and every preceding allegation as if fully set herein.

137. CNA's conduct constitutes discrimination on the basis of disability under Puerto Rico Laws Nos. 44 and 53.

138. Hernández has suffered severe economic and emotional damages as a result of CNA's discrimination on account of his disability.

139. CNA is liable to Hernández for double the economic, emotional and special damages and continuous loss of income caused as a proximate result of its discriminatory conduct on the basis of disability.

## IX. FIFTH CAUSE OF ACTION (Retaliation under Puerto Rico Law No. 115)

140. Hernández repeats and incorporates by reference each and every preceding allegation as if fully set herein.

141. Hernández engaged in "protected conduct" under Law No. 115.

142. As a result of engaging in protected conduct, CNA retaliated against Hernández in violation of Law No. 115.

143. Hernández has suffered severe emotional and economic damages as a result of CNA's retaliation against him.

144. CNA is liable to Hernández for double the economic, emotional and special damages and continuous loss of income caused as a proximate result of defendants' discriminatory conduct, together with an award of costs and attorneys' fees.

### X. SIXTH CAUSE OF ACTION (Constructive Discharge under Puerto Rico Law No. 80)

145. Hernández repeats and incorporates by reference each and every preceding allegation as if fully set herein.

146. CNA constructively discharged Hernández without just cause in violation of Puerto Rico Law No. 80.

147. As a result of Hernández's wrongful termination, he is entitled to indemnity under Law No. 80 in the total amount of $177,499.98, plus statutory attorney's fees.

### XI. DEMAND FOR JURY TRIAL

148. Hernández hereby demands that all of his causes of action be tried before a jury.

**WHEREFORE**, all premises considered, Hernández prays from this Honorable Court the following relief:

1. An order directing defendant to cease and desist of any further discriminatory and retaliatory conduct against him;

2. Loss of income;

3. Lost benefits both, past and future;

4. Compensatory and emotional damages in an amount not less than $750,000.00;

5. Double compensatory, emotional and economic damages under Laws Nos. 44, 53 and 115.

6. Punitive damages in an amount not less than $299,999.00;

7. An award of reasonable attorneys' fees, together with costs, litigation expenses and necessary disbursements;

8. Indemnity under Puerto Rico Law No. 80 in the amount of $177,499.98, plus statutory attorneys' fees;

9. Prejudgment interests;

10. An income tax differential for any amount to be paid by Hernández in excess of his usual personal income tax rate as a result of compensation for lost income as relief for defendants' discriminatory conduct; and

11. Any other remedies which this court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 28th day of October, 2016.

| | |
|---|---|
| **LAW OFFICE OF CARLOS VERGNE** | **GONZÁLEZ MUÑOZ LAW OFFICES, PSC** |
| 24 Mariana Bracetti St., 2nd Floor | P.O. Box 9024055 |
| San Juan, PR 00918 | San Juan, PR 00902-4055 |
| Tel. (787) 753-3799 | Tel. (787) 766-5052 |
| Fax (787) 759-8429 | Fax (787) 766-5551 |
| e-mail: carlosvergne@aol.com | e-mail: info@gonzalezmunozlaw.com |
| | |
| *s/Carlos M. Vergne Vargas* | *s/Juan Rafael González Muñoz* |
| CARLOS M. VERGNE | JUAN RAFAEL GONZÁLEZ MUÑOZ |
| USDCPR No. 209611 | USDCPR No. 202312 |